[Cite as *Westfield Twp. Zoning Inspector v. Emerald Bioenergy, L.L.C.*, 2021-Ohio-3843.]

COURT OF APPEALS
MORROW COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE WESTFIELD TOWNSHIP ZONING INSPECTOR | JUDGES:<br>Hon. William B. Hoffman, P. J.<br>Hon. John W. Wise, J. |
| Plaintiff-Appellant | Hon. Earle E. Wise, Jr., J. |
| -vs- | Case No. 2021 CA 0001 |
| EMERALD BIOENERGY, LLC | |
| Defendant-Appellee | O P I N I O N |

CHARACTER OF PROCEEDING:     Civil Appeal from the Court of Common Pleas, Case No. 2020 CV 00053

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     October 28, 2021

APPEARANCES:

For Plaintiff-Appellant

DAVID HOMER
ASSISTANT PROSECUTOR
60 East High Street
Mt. Gilead, Ohio 43338

For Defendant-Appellee

CATHERINE CUNNINGHAM
KEGLER, BROWN, HILL & RITTER
65 East State Street, Suite 1800
Columbus, Ohio 43215

N. TREVOR ALEXANDER
BENESCH, FRIEDLANDER, COPLAN
& ARANOFF
41 South High Street, Suite 2600
Columbus, Ohio 43215

*Wise, John, J.*

{¶1}   Appellant The Westfield Township Zoning Inspector appeals the February 2, 2021, decision by the Morrow County Court of Common Pleas, dismissing its Complaint for Injunction Due to a Zoning Violation filed against Appellee Emerald Bioenergy, LLC.

## STATEMENT OF THE FACTS AND CASE

{¶2}   The relevant facts and procedural history are as follows:

{¶3}   On April 16, 2020, Appellant Westfield Township Zoning Inspector (Westfield Township) filed a "Complaint for Injunction Due to a Zoning Violation" against Appellee Emerald Bioenergy, LLC, (Emerald) along with other individually named defendants who were subsequently dismissed by the trial court. The Complaint sought to enjoin the business from operating its anaerobic biodigester in the township as if it were an agricultural use of the land because it was located in a district zoned for agricultural use only, in which people lived and worked.

{¶4}   In paragraph 19 of its Complaint, Appellant asserted "[t]he stench and noise from the biodigester are constantly emitted from the defendant's premises at all times of the day and night. The people of Westfield Township are deprived of the enjoyment of their property."

{¶5}   In its Answer, at paragraph 19, Appellant stated "as long as at least fifty percent of the feedstock used in the biodigester is derived from parcels of land contiguous to or part of parcels otherwise devoted exclusively to agricultural use that are under common ownership or leasehold, the biodigester facility is an agricultural use exempt from township zoning under state law and … R.C. 5713.30 is relevant to that determination."

**{¶6}** On December 14 and December 29, 2020, a bench trial was held.

**{¶7}** At the bench trial, the trial court heard testimony and received evidence as follows:

**{¶8}** Emerald operates an anaerobic biodigester on Morrow County Tax Parcel R4 1-001-00-123-02. Anaerobic digestion is a natural process by which microorganisms break down organic matter in a closed space without oxygen and produce biogas that is used to generate electricity. (T. at 333-334). The Biodigester was built in 2013 as a renewable energy facility that would process farm and other biological waste and convert it into renewable energy. (T. at 50, 214-218, 331-334, 364). The Permit to Install the Biodigester was issued by the Ohio Environmental Protection Agency ("OEPA") in 2012 and allows Emerald to process a variety of biological feedstocks including animal manure, food wastes and sewage sludge (biosolids), which are used to produce biologically-derived methane gas that is used to generate electricity, and fertilizer.

**{¶9}** The Biodigester is located on property owned by Ringler Energy, LLC, a company owned by Alex Ringler and leased to Emerald. (T. at 190, 328-332). Alex Ringler and his companies own 510 acres of property and farming operations contiguous to the Property that are all subject to current agricultural use valuation (CAUV) and include a hog farm with finishing barns housing 7,000 hogs, row crops and other farming operations.

**{¶10}** Testimony was presented by Alex Ringler and Michael Oberfield, Chief Financial Officer of Renergy, Emerald's parent company, that the Biodigester is integral to the adjacent Ringler farming operations. It directly accepts and processes 100% of the manure from the farm through a closed underground piping system. It also accepts other

biological feedstocks including food waste and, at one time, biosolids that produce methane gas within the Biodigester that is used to generate electricity. (T. at 213-216, 331-334). A small portion of that electricity powers the entire Ringler Farm, and the remainder is sold through Buckeye Power, Inc., a local electric co-op, to the wholesale electric grid for public consumption. The fertilizer it produces is used on Ringler and other farm fields. (Tr. 212-218, 329-332). It is a continuing integrated process and system. (Tr. 445-451).

{¶11} John Bentine, an attorney who worked at PUCO and the Attorney General's office as counsel to PUCO, was called by Appellant as an expert witness in public utility issues in the state of Ohio. He testified that Emerald's name plate generation capacity for electricity is 850 kW, over three times the minimum 250 kW statutory threshold of the size that Ohio renewable energy resources are required to have, which subjects it to government regulation. (T. at 412-414). Atty. Bentine stated that although Emerald does not generate electricity on the same scale as big coal-fired or nuclear units, it "nonetheless, is a significant size in terms of its effect on the overall electric system, especially locally in the area" where it would serve someplace between 500 and 800 homes. (T. at 412-414). He stated that the electricity generated is a "renewable energy resource" as certified by the Public Utilities Commission of Ohio ("PUCO") since 2014. (T. at 412-414). As such, Emerald is certified to produce "Renewable Energy Credits" which are sold into the public market. (T. at 339-344).

{¶12} At its inception, the Biodigester received support from Morrow County and others. The State of Ohio and United States government have adopted laws providing for a variety of grants and tax incentives to implement their policies to encourage the

development and use of renewable energy. (T. at 53-55, 419-420). Emerald received a $500,000 grant and loan guarantees from the United States Department of Agriculture for its $5.5 million investment in the facility. (T. at 187-191, 419-420). It also received a public utility tax exemption and "Conversion Facilities Tax Exemption Certificate" through the Ohio Development Services Agency for the Biodigester as a solid waste conversion facility based on a 2016 Ohio Tax Commissioner finding. (T. at 47, 53, 56, 58-60, 67).

{¶13} According to Mr. Oberfield, the first objection received by Emerald from Westfield Township regarding the Biodigester or its use was the notice of violation it received on September 25, 2019. (T. at 358-359).

{¶14} Patricia Davies, who at the time was the Morrow County Director of Operations[1], testified that the State of Ohio determines whether an entity is a public utility for purposes of the personal property tax. (T. at 56-62). Ohio made that determination for Emerald and has been taxing Emerald as a public utility since at least 2015. (T. at 56-60). Emerald has also been paying public utility taxes to Morrow County, including Westfield Township, since 2015, subject to its solid waste energy conversion facility tax exemption. (T. at 56-60).

{¶15} Ms. Davies worked with Emerald to establish the facility and make connections for Emerald to obtain federal and state government financial incentives, including grants and tax exemptions to build a leading-edge renewable energy facility on the Ringler Farm. (T. at 62-64). Ms. Davies also helped Emerald make connections and negotiate with the local electric Co-Op and Consolidated for the provision of electricity from the Biodigester to the grid. (*Id.*).

---

[1] Patricia Davies is currently the Morrow County Auditor.

{¶16} Testimony and evidence were also presented with regard to Emerald's regulation by state and federal agencies such as the Public Utilities Commission of Ohio ("PUCO"), the Generation Attribute Tracking System ("GATS") for renewable resources, PJM, the regional transmission organization (RTO) managing the Ohio electric grid, the Federal Energy Regulatory Commission ("FERC"), and the federal Public Utility Regulatory Policies Act of 1978 ("PURPA") for Qualifying Small Power Producer. (T. at 338-359).

{¶17} Emerald also has an interconnection agreement with Consolidated Electric Co-Op, a distribution utility, and contractual and regulatory obligations to Buckeye Power, which purchases the electricity Emerald generates and puts it in the Ohio electric grid for consumer use. (T. at 413-41).

{¶18} The Ohio Environmental Protection Agency ("Ohio EPA") also regulates Emerald. Emerald currently holds multiple environmental permits including: a Permit To Install and a National Pollutant Discharge Elimination System (NPDES) which includes Land Application and a Land Management Plan for its fertilizer. (T. at 97-100, 111-112, 129-132). Emerald also has an Air Quality Permit (Regional Air Pollution Control Agency) which regulates the Biodigester's compressor and flare. (T. at 149-151). The Ohio EPA permits include the regulation of odors. The Ohio EPA has inspected the Emerald facility and investigated odor complaints 10 to 15 times and never found an odor violation. (T. at 116-118).

{¶19} In 2012, when the Biodigester was first being constructed, Emerald applied to the Ohio EPA for an air permit and was advised it did not need one because it met the agricultural exemption under the Ohio EPA rules. (T. at 149). In 2018, the Ohio EPA

contacted Emerald and requested that they obtain an air permit for the Biodigester engine and gas flare because they may no longer meet the Ohio EPA agricultural exemption for an air permit, which Emerald promptly applied for and received. (T. at 150-152). As part of the air permitting process, when Emerald filed an air permit application at Ohio EPA's request, the Ohio EPA provided public notice that an air permit application had been filed. (*Id.*)

**{¶20}** On or about September 25, 2019, the Morrow County Prosecutor sent Emerald a notice of zoning violation ("n.o.v.") that included a letter from the Westfield Township Zoning Inspector, Joel Staley, stating "It has come to my attention that Emerald Bioenergy, LLC has lost its agricultural status and it no longer has an agricultural exemption. This has been determined by the Ohio EPA on 8/24/2018." The prosecutor asserted in a separate letter that Emerald's use of land in Westfield Township had become an "industrial use" that no longer qualified for an agricultural exemption under the Westfield Township Zoning Resolution or state law, and Emerald must cease its operations.

**{¶21}** Emerald timely appealed the decision of the Zoning Inspector and notice of violation to the Westfield Township Board of Zoning Appeals. No action was ever taken on that appeal by the BZA, and the matter was never set for hearing.

**{¶22}** Michael Oberfield testified that after Emerald received the notice of violation, it immediately began adjusting its feedstock mix to increase manure and eliminate biosolids in an attempt to address the township's concerns. (T. at 364-372). He stated that since January 1, 2020, its feedstocks have been comprised of more than 50%

hog manure from the adjacent Ringler farms, and it no longer accepts biosolids as a feedstock. (T. at 364-372).

{¶23} On May 12, 2020, Appellant filed a complaint for a statutory injunction in the Morrow County Common Pleas Court requesting that the trial court find a violation and enforce the township zoning pursuant to R.C. §519.24.

{¶24} By Judgment Entry filed February 2, 2021, the trial court found in favor of Appellee Emerald Bioenergy, LLC. It determined that Emerald operates as a public utility and is not subject to the zoning regulations of Westfield Township. The trial court also found that as long as Emerald uses at least 50% of its feedstock from hog manure generated through Ringler Feedlots, LLC, and Ringler Livestock, LLC, it qualifies as land used exclusively for agricultural purposes and is not subject to zoning.

{¶25} Appellant Westfield Township Zoning Inspector now appeals, raising the following assignments of error for review:

### ASSIGNMENTS OF ERROR

{¶26} "I. APPELLEE EMERALD IS SUBJECT TO THE LAWFUL ZONING AUTHORITY OF WESTFIELD TOWNSHIP BECAUSE THE TRIAL COURT ERRED PREJUDICIALLY IN DETERMINING THAT EMERALD'S ANAEROBIC BIODIGESTER IS A "PUBLIC UTILITY" WITHIN THE MEANING OF R.C. 519.211.

{¶27} "II. APPELLEE EMERALD FAILED TO MEET ITS BURDEN OF PROOF TO ESTABLISH ITS PERMITS GRANTING EXEMPTIONS OR GOVERNING OPERATIONS ARE NOT OBTAINED PURSUANT TO REVISED CODE CHAPTER 3744, PLACING THE TRUSTEES, THE ZONING INSPECTOR AND THE CITIZENS OF

WESTFIELD TOWNSHIP WITHIN THE CLASS OF PEOPLE SOUGHT TO BE PROTECTED TO THE EXCEPTION TO THE REVISED CODE SECTION 519.211."

**I., II.**

**{¶28}** As both of Appellant's assignments of error challenge the trial court's February 2, 2021, findings, we shall address them together.

**{¶29}** This matter came before the trial court on a Complaint for statutory injunction filed by the township, requesting a permanent injunction against Appellee based upon a violation of a zoning ordinance.

*Standard of Review*

**{¶30}** An abuse of discretion standard applies to the trial court's ultimate ruling denying injunctive relief under Civ.R. 65. *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 73 Ohio St.3d 590, 591, 653 N.E.2d 646 (1995), paragraph three of the syllabus ("The issue whether to grant or deny an injunction is a matter solely within the discretion of the trial court and a reviewing court will not disturb the judgment of the trial court in the absence of a clear abuse of discretion."). An "unreasonable, arbitrary, or unconscionable" action by the trial court amounts to an abuse of discretion. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). To find an abuse of discretion, the appellate court must conclude that the trial court's ruling "lacks a 'sound reasoning process.'" *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, 972 N.E.2d 528, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶31}** Appellant herein argues the trial court erred in determining that Emerald is a public utility within the meaning of R.C. §519.211 and therefore exempt from township zoning regulations. We disagree.

**{¶32}** R.C. §519.211 (A), which sets forth limitations on zoning powers, provides:

Except as otherwise provided in division (B) or (C) of this section, sections 519.02 to 519.25 of the Revised Code confer no power on any board of township trustees or board of zoning appeals in respect to the location, erection, construction, reconstruction, change, alteration, maintenance, removal, use, or enlargement of any buildings or structures of any public utility or railroad, whether publicly or privately owned, or the use of land by any public utility or railroad, for the operation of its business. As used in this division, "public utility" does not include a person that owns or operates a solid waste facility or a solid waste transfer facility, other than a publicly owned solid waste facility or a publicly owned solid waste transfer facility, that has been issued a permit under Chapter 3734. of the Revised Code or a construction and demolition debris facility that has been issued a permit under Chapter 3714. of the Revised Code.

**{¶33}** While the above-statute exempted public utilities from zoning restrictions, the General Assembly did not define "public utility" insofar as it relates to R.C. 519.211.

**{¶34}** The definition of "Public Utility" has therefore been developed through case law. The Ohio Supreme Court cases of *Marano v. Gibbs,* 45 Ohio St.3d 310, 544 N.E.2d 635 (1989), *A & B Refuse Disposers, Inc. v. Ravenna Twp. Bd. of Trustees,* 64 Ohio St.3d 385, 596 N.E.2d 423 (1992), and *Rumpke Sanit. Landfill, Inc. v. Colerain Twp.*, 134 Ohio

St.3d 93, 2012-Ohio-3914, 980 N.E.2d 952, ¶¶ 16-27, offer guidance as to what constitutes a public utility for purposes of R.C. 519.211.

**{¶35}** In *Marano v. Gibbs,* the Ohio Supreme Court that "the determination of entities as public utilities is a mixed question of law and fact." *Marano v. Gibbs* at 311, 544 N.E.2d 635. "[I]n determining public utility status" courts must examine "the character of the business in which the entity is engaged." *Id.*, citing *Ohio Power Co. v. Attica,* 23 Ohio St.2d 37, 41, 261 N.E.2d 123 (1970). " 'To constitute a "public utility," the devotion to public use must be of such character that the product and service is available to the public generally and indiscriminately or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state.' " *Id.*, quoting *S. Ohio Power Co. v. Pub. Util. Comm.,* 110 Ohio St. 246, 143 N.E. 700 (1924).

**{¶36}** The Court set forth two factors, i.e., public concern and public service, which must be taken into consideration to determine whether an entity is a public utility for purposes of R.C. 519.211. "[A]n entity may be characterized as a public utility if the nature of its operation is a matter of public concern, and membership is indiscriminately and reasonably made available to the general public," otherwise known as public service. *Marano,* 45 Ohio St.3d at 311, 544 N.E.2d 635.

**{¶37}** The Court further developed the definition of "public utility" in *A & B Refuse Disposers, Inc. v. Ravenna Twp. Bd. of Trustees.* A & B Refuse Disposers, Inc. operated a landfill in Ravenna Township, Portage County. A & B Refuse acquired a 66–acre parcel of land adjacent to the landfill intending to construct a truck terminal and offices. After discussing the proposed use with township officials, A & B Refuse was advised that the proposed use would probably not be approved for rezoning. A & B Refuse filed a

declarative-judgment action against the Ravenna Township Board of Trustees, asking for a determination of whether its landfill operation was subject to regulation under the township zoning code.

**{¶38}** In *A & B Refuse,* the Court "significantly expanded upon the two factors identified in *Marano,* holding that 'the determination of whether a particular entity is a public utility for the purpose of exemption from local zoning restrictions requires a consideration of several factors related to the 'public service' and 'public concern' characteristics of a public utility.' " *Id.* at 389, 596 N.E.2d 423.

**{¶39}** "[T}he determination of public utility status requires a flexible rule, a rule which often intertwines the factors considered in relation to the concepts of 'public service' and 'public concern.' " *Id.*

**{¶40}** As for the public-service factor, the Court held that one must look at whether there:

> . . . is a devotion of an essential good or service to the general public which
> has a legal right to demand or receive this good or service. *S. Ohio Power*
> *Co. v. Pub. Util. Comm.* (1924), 110 Ohio St. 246, 252, 143 N.E. 700, 701,
> quoting *Allen v. RR. Comm. of California* (1918), 179 Cal. 68, 175 P. 466;
> *Freight, Inc. v. Northfield Ctr. Bd. of Twp. Trustees* (1958), 107 Ohio App.
> 288, 292–293, 8 O.O.2d 212, 215, 158 N.E.2d 537, 540; *Motor Cargo v.*
> *Richfield Bd. of Twp. Trustees* (1953), 67 Ohio Law Abs. 315, 318, 52 O.O.
> 257, 258, 117 N.E.2d 224, 226. *See*, generally, 2 Anderson, American Law
> of Zoning (3 Ed.1986) 568, Section 12.32. * * * [T]he entity must * * * provide
> its good or service to the public indiscriminately and reasonably. *Marano v.*

*Gibbs,* [45 Ohio St.3d] at 311, 544 N.E.2d at 636. * * * Further, this attribute requires an obligation to provide the good or service which cannot be arbitrarily or unreasonably withdrawn.

**{¶41}** *A & B Refuse,* 64 Ohio St.3d at 389, 596 N.E.2d 423.

**{¶42}** "The fact that a private business provides a good or service associated with the usual subject matter of a public utility does not give rise to a presumption that it is devoted to public service." *Id.*, *citing S. Ohio Power Co. v. Pub. Util. Comm.,* 110 Ohio St. 246, 143 N.E. 700 (1924), paragraph one of the syllabus.

**{¶43}** As for the public-concern factor, the Court held:

Normally, a public utility occupies a monopolistic or ogopolistic [sic] position in the marketplace. *Greater Fremont, Inc. v. Fremont* (N.D.Ohio 1968), 302 F.Supp. 652, 664–665. *See, also, Mammina v. Cortlandt Zoning Bd. of Appeals* (1981), 110 Misc.2d 534, 442 N.Y.S.2d 689, 691. This position gives rise to a public concern for the indiscriminate treatment of that portion of the public which needs and pays for the vital good or service offered by the entity. Factors utilized in determining whether an enterprise conducts itself in such a way as to become a matter of public concern include the good or service provided, competition in the local marketplace, and regulation by governmental authority. * * * [N]one of these factors is controlling. Nevertheless, in a case where the business enterprise serves such a substantial part of the public that its rates, charges and methods of operation become a public concern, it can be characterized as a public

utility. *Indus. Gas Co. v. Pub. Util. Comm., supra,* 135 Ohio St. [408] at 414, 21 N.E.2d [166] at 168 [1939].

**{¶44}** (Citations and footnotes omitted.) *Id.* at 388, 596 N.E.2d 423.

**{¶45}** The Court further held that "the determination of public utility status requires a flexible rule, a rule which often intertwines the factors considered in relation to the concepts of 'public service' and 'public concern.' " *Id.*

**{¶46}** Additionally, the Court determined that the business claiming public-utility status bears the burden of offering sufficient evidence on these factors. *Id.*

*Public–Service/ Public Concern Factors*

**{¶47}** Upon review of the record before us, we find that the trial court heard testimony and received evidence as to the following:

**{¶48}** On August 13, 2012, the Ohio EPA issued Ringler Energy, LLC, a permit to operate an anaerobic digester. This permit was subsequently transferred to Emerald Bioenergy, LLC.

**{¶49}** On March 15, 2014, Emerald was granted a permit by the PUCO to operate as a "Renewable Energy Resource Generating Facility", which allows it to generate methane gas by anaerobic digestion to creating a source of renewable energy. As a certificate holder, Emerald is subject to all applicable rules and regulations of the PUCO.

**{¶50}** Both the State of Ohio and Morrow County treat Emerald as a public utility for tax purposes. Emerald pays public utility taxes on both real and personal property to Morrow County and has been doing so since 2015. Emerald received an exemption from public utility personal property taxes on the Biodigester since 2015 because it is certified as an Energy Solid Waste Conversion and Thermal Efficiency Improvement Facility.

**{¶51}** Emerald produces electrical energy from methane gas derived from agricultural and other biological waste fuel sources which is collected and used to power an electric generator. Emerald then provides electricity to the general public. It provides the electricity to the Ohio energy grid, which indiscriminately provides same to the public, i.e. Ohio consumers, through Buckeye Power and the local electric cooperative. Emerald has an interconnection agreement with Consolidated Co-Op, a distribution utility and a purchase agreement with Buckeye Power. (T. at 415). Emerald's interconnection agreement with Consolidated Co-Op contains provisions governing certain factors of the facility.

**{¶52}** The only market for the electricity generated by Emerald is the power grid and the electric cooperative. So long as it stays in operation, Emerald does not have the ability to arbitrarily or unreasonable withdraw its services, as it is a closed system which requires the methane it produces to be used to generate electricity. Emerald cannot stop generating electricity without ceasing the balance of its operations. In addition to the terms of the contracts with Buckeye Power and Consolidated Co-Op, the sale of the electricity is subject to federal, state and PJM regulations.

**{¶53}** PJM, the regional transmission organization, holds authority delegated by the FERC over management of Ohio's electrical transmission grid and wholesale generation market, and provides the only market for wholesale energy generated in Ohio.

**{¶54}** Emerald indiscriminately provides electric energy to the Ohio energy grid, which is regulated, and indiscriminately provides energy to consumers in the state Ohio and the regional electric power system.

**{¶55}** Once Emerald provides electricity to the wholesale power grid, it has no control over what customers receive or use it. (T. at 436).

**{¶56}** Emerald's contracts require it to provide energy to the grid, which cannot be arbitrarily or unreasonably withdrawn.

**{¶57}** Emerald's generation also indiscriminately provides renewable energy credits through its PUCO renewable energy resource certification and the Generation Attribute Tracking System (GATS). Emerald's operations and PUCO certification require it to provide renewable energy credits, which cannot be arbitrarily or unreasonably withdrawn.

**{¶58}** Testimony was also presented that Emerald is under contract to receive the waste stream it uses to generate the electricity, and that it would accept any qualified material from any customer willing to pay the requisite fee.

**{¶59}** Based on the foregoing, including the governmental regulations and oversight present in this matter, we do not find that the trial court abused its discretion in holding that Emerald Bioenergy is a public utility and is therefore exempt from the Westfield Township zoning laws pursuant to R.C. §519.211.

**{¶60}** Because the trial court herein found an alternate, independent ground to support its finding that Appellee is a public utility, not subject to zoning regulations, which this Court found to be supported by the record, we find any analysis as to the "agricultural use exemption" unnecessary under the two-issue rule. "By virtue of the two-issue rule, a decision which is supported by one or more alternate grounds properly submitted is invulnerable to attack on one issue only." *Freeport Lodge # 415 Free & Accepted Masons of Ohio v. MC Mineral Company,* 5th Dist. Guernsey No. 18 CA 2, 2018-Ohio-3783, ¶ 12,

citing *Suermondt v. Lowe,* 5th Dist. Morgan No. 10-CA-2, 2011-Ohio-5752, ¶ 22, citing *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 185, 729 N.E.2d 726 (2000).

**{¶61}** Appellant's first assignment of error is overruled.

**II**.

**{¶62}** Appellant, in its second assignment of error, argues that the trial court erred in finding that Emerald does not operate a "solid waste facility" for purposes of R.C. §519.211(A).

**{¶63}** As set forth above, R.C. §519.211(A) "public utility" does not include a person that owns or operates a solid waste facility or a solid waste transfer facility, other than a publicly owned solid waste facility or a publicly owned solid waste transfer facility, that has been issued a permit under Chapter 3734. of the Revised Code."

**{¶64}** Upon review, we find no evidence in the record to prove, or otherwise suggest, that Emerald was ever "issued a permit under Chapter 3734. of the Revised Code". Rather, evidence was presented to the contrary. Mike Oberfield, CFO of Emerald, testified clearly that Emerald is not licensed as a solid waste facility. (T. at 390-391). Further, the EPA has not classified the Biodigester as a solid waste facility, nor does it require Emerald to obtain a solid waste permit. (T. at 110-112, 130-133, 149-157).

{¶65} Based on the foregoing, we find Appellant's second assignment of error not well-taken and hereby overrule same.

{¶66} Accordingly, the judgment of the Court of Common Pleas, Morrow County, Ohio, is affirmed.

By: Wise, John, J.

Hoffman, P. J., and

Wise, Earle, J., concur.

JWW/kw 1025